# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

VRAJESHKUMAR PATEL, individually and on behalf of all others similarly situated, and derivatively on behalf of Nominal Defendant TALOS ENERGY INC.,

        Plaintiff,

        v.

TIMOTHY S. DUNCAN, NEAL P. GOLDMAN, CHRISTINE HOMMES, JOHN "BRAD" JUNEAU, DONALD R. KENDALL, JR., RAJEN MAHAGAOKAR, CHARLES M. SLEDGE, ROBERT M. TICHIO, JAMES M. TRIMBLE, OLIVIA C. WASSENAAR, RIVERSTONE HOLDINGS, LLC, RIVERSTONE TALOS ENERGY EQUITYCO LLC, RIVERSTONE TALOS ENERGY DEBTCO LLC, APOLLO GLOBAL MANAGEMENT, INC., APOLLO TALOS HOLDINGS, L.P., AP TALOS ENERGY DEBTCO LLC, and GUGGENHEIM SECURITIES, LLC,

        Defendants,

    and

TALOS ENERGY INC.,

        Nominal Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2020-0418-MTZ

## MEMORANDUM OPINION

Date Submitted: September 30, 2021
Date Decided: September 30, 2021

Stephen E. Jenkins and F. Troupe Mickler IV, ASHBY & GEDDES, P.A., Wilmington, Delaware; Eduard Korsinsky, Gregory M. Nespole, and Daniel Tepper, LEVI & KORSINSKY, LLP, New York, New York, *Attorneys for Plaintiff.*

Kevin R. Shannon, Matthew F. Davis, and Justin T. Hymes, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; David M. Zensky and Brian Carney, AKIN GUMP STRAUSS HAUER & FELD LLP, New York, New York; Scott Barnard, AKIN GUMP STRAUSS HAUER & FELD LLP, Dallas Texas, *Attorneys for Defendants Timothy S. Duncan, Neal P. Goldman, Christine Hommes, John "Brad" Juneau, Donald R. Kendall, Jr., Rajen Mahagaokar, Charles M. Sledge, Robert M. Tichio, James M. Trimble, and Olivia C. Wassenaar and Nominal Defendant Talos Energy Inc.*

David E. Ross, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Andrew B. Clubok, J. Christian Word, and Stephen P. Barry, LATHAM & WATKINS, LLP, Washington, D.C., *Attorneys for Defendants Defendant Riverstone Holdings, LLC, Riverstone Talos Energy Equityco LLC and Riverstone Talos Energy Debtco LLC*.

Rudolf Koch and Matthew D. Perri, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Bruce Birenboim, Susanna M. Buergel, and Christopher L. Filburn, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP, New York, New York, *Attorneys for Defendants Apollo Global Management, Inc., Apollo Talos Holdings, L.P., and AP Talos Energy Debtco LLC*.

William B. Chandler, III and Andrew D. Cordo, WILSON SONSINI GOODRICH & ROSATI, Wilmington, Delaware; Mark A. Kirsch and Randy M. Mastro, GIBSON DUNN & CRUTCHER, New York, New York, *Attorneys for Defendant Guggenheim Securities, LLC*.

**ZURN, Vice Chancellor.**

In February 2020, an oil and gas company purchased a set of oil-producing assets from an affiliate of one of its private equity sponsors. The plaintiff in this action, one of the company's public stockholders, challenges the fairness of that transaction. He alleges the company's financial advisor gave a flawed fairness opinion, severely undervaluing the company while significantly overvaluing the assets it purchased. The advisor had done business with affiliates of a second private equity sponsor. Based on the advisor's discrepant opinion, the company overpaid for the assets and, because the transaction involved issuing and transferring stock to the sellers, unfairly diluted the company's minority stockholders.

The stockholder challenges the transaction as manifestly unfair. He starts with the advisor's flawed opinion and works backwards, alleging the transaction must have been effectuated by the two private equity sponsors as a control group. While, if treated as a group, the two sponsors control a majority of the company's stock, the stockholder has not sufficiently pled that the two firms formed such a group. He alleges the sponsors effectuated the transaction to continue a cycle of saving each other from bad investments. But he falls short of alleging any agreement between the sponsors that would support such a finding, or any other indication of a transaction-specific connection. In short, despite relying on a purported wink-and-nod agreement between the private equity sponsors, the stockholder alleges neither a wink nor a nod. Rather, he rests his theory on the facts that each transaction

involved an affiliate of one of the two sponsors, and that, in his view, both transactions were substantively unfair. Even at this early stage, these allegations are insufficient. This opinion concludes the stockholder has failed to allege the private equity sponsors formed a control group and so, the breach of fiduciary duty counts against them must be dismissed.

From there, the rest of the stockholder's claims unravel. In light of the Delaware Supreme Court's decision early last week in *Brookfield Asset Management, Inc. v. Rosson*,[1] the stockholder voluntarily dismissed his direct claims by a stipulation filed today. He is therefore left to pursue derivative claims on the company's behalf. But under the new universal test for demand futility announced late last week in *United Food and Commercial Workers Union v. Zuckerberg* (*Zuckerberg II*),[2] he lacks standing to bring those claims under Court of Chancery Rule 23.1. For the reasons that follow, I grant the defendants' motions to dismiss in their entirety.

## I. BACKGROUND[3]

The Verified Stockholder Derivative and Class Action Complaint (the "Complaint") in this action challenges nominal defendant Talos Energy Inc.'s

---

[1] — A.3d —, 2021 WL 4260639 (Del. Sept. 20, 2021).

[2] — A.3d —, 2021 WL 4344361 (Del. Sept. 23, 2021).

[3] On this motion to dismiss, I draw the following facts from plaintiff's Verified Class Action Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached and integral to it. *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL

("Talos" or the "Company") February 28, 2020, purchase of certain oil-producing assets (the "Challenged Transaction"). Plaintiff Vrajeshkumar Patel ("Plaintiff") was a Talos stockholder at all relevant times, and purports to bring his claims derivatively and on behalf of Talos's other similarly situated public stockholders.

### A. The Parties Form Talos With Backing From Private Equity Sponsors.

In 2012, Defendant Timothy S. Duncan formed the Company's predecessor, Talos Energy LLC ("Old Talos"). From its inception, Old Talos was backed by funds affiliated with defendants Riverstone Holdings, LLC, ("Riverstone Parent") and Apollo Global Management, Inc. ("Apollo Parent"). Riverstone Parent invested in Old Talos through defendants Riverstone Talos Energy Equityco LLC and Riverstone Talos Energy Debtco LLC (the "Riverstone Funds," and together with Riverstone Parent, "Riverstone"). Apollo Parent similarly invested in Old Talos through defendants Apollo Talos Holdings, L.P., and AP Talos Energy Debtco LLC (the "Apollo Funds," and together with Apollo Parent, "Apollo"). Together, Riverstone and Apollo are the "Venture Capital Defendants."

---

6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "Hymes Decl. —" refer to the exhibits attached to the Transmittal Declaration Pursuant to 10 *Del. C.* § 3927 of Justin T. Hymes to Opening Brief in Support of the Talos Defendants' Motion to Dismiss, available at D.I. 27 and D.I. 29.

3

Nonparty Gregory A. Beard was instrumental in the Venture Capital Defendants' initial investment in Old Talos. Beard co-founded Riverstone, but moved to Apollo in 2010. In 2012, he "orchestrated" the transaction through which Riverstone and Apollo "gained control of Old Talos," aided by Riverstone's other co-founders, nonparties Pierre Lapeyre and David Leuschen.[4] Lapeyre and Leuschen had also worked with Duncan in a previous oil company, Phoenix Exploration Co. LP. After investing in Old Talos, Lapeyre and Leuschen publicly commented: "We are excited to build another company with Tim. This investment exemplifies Riverstone's strategy of re-partnering with proven management teams. We look forward to repeating the success we had with Phoenix."[5]

The Venture Capital Defendants received substantial yearly fees for their "management consulting and advisory services" for Old Talos, as well as a "transaction fee" equal to 2% of their initial investment.[6]

### 1. The Stone Energy Combination

On May 18, 2018, Old Talos and nonparty Stone Energy Corporation ("Stone Energy") combined to form Talos (the "Combination"). The Combination resulted in the Riverstone Funds owning 27.5% of the Company's shares, the Apollo Funds

---

[4] Compl. ¶ 37.

[5] *Id.* ¶ 23 (alteration omitted).

[6] *Id.* ¶ 13.

owning 35.4%, and Stone Energy's former stockholders owning the remaining 37.1%. The Company became a publicly traded Delaware corporation, describing itself as "a leading offshore energy company focused on oil and gas exploration and production in the United States Gulf of Mexico and offshore Mexico."[7] Since the Combination, the Company has been managed by a ten-member board of directors (the "Board"). The Company's certificate of incorporation contains a provision exculpating the Board from breaches of the duty of care pursuant to 8 *Del. C.* § 102(b)(7).[8]

### 2. The Stockholders' Agreement

Contemporaneously with the Combination, the Venture Capital Defendants, through their affiliated funds, entered into a Stockholders' Agreement (the "Stockholders' Agreement").[9] In the Stockholders' Agreement, the Venture Capital

---

[7] *Id.* ¶ 11 (alteration omitted).

[8] *See* Hymes Decl. Ex. 2 § 7.1.

[9] *See* Hymes Decl. Ex. 6.

Defendants agreed to a paradigm for jointly designating six members of Talos's Board:

> The Company Board shall initially consist of ten members comprised of (i) two directors designated by the Apollo Parties, (ii) two directors designated by the Riverstone Parties, (iii) one Independent Director jointly designated by the [Venture Capital Defendants], (iv) the Chief Executive Officer of the Company and (v) four directors, including the chairman of the Company Board, that are Company Independent Directors, initially designated by Stone Energy in accordance with the [Combination] Agreement. Until the second annual meeting of stockholders held after the date of this Agreement, the Company and each Stockholder shall take all Necessary Action to cause the Chairman of the Company Board to be a Company Independent Director.[10]

In sum, Riverstone and Apollo each designated two Board directors, agreed to designate one director jointly, and also agreed Duncan, the Company's CEO, should sit on the Board; the remaining four directors were initially designated by Stone Energy.[11]

After the Combination, the Company filed a Form S-4 Registration Statement on September 14, 2018. That filing indicated that Talos is a "controlled company" under applicable New York Stock Exchange ("NYSE") rules:

> ***We are controlled by Apollo Funds and Riverstone Funds. The interests of Apollo Funds and Riverstone Funds may differ from the interests of our other stockholders.***

---

[10] *Id.* § 3.1(a). The parties agreed to support one another's nominees to effectuate the goal outlined above. *See id.* § 3.1(c); *see also id.* § 1.1 (defining "Necessary Action").

[11] *Id.* at § 3.1(a); *see also* Hymes Decl. Ex. 25 at 173.

Immediately following the closing of the [Combination], the stakeholders of Talos Energy LLC beneficially owned and possessed voting power over 63% of our common stock. Under the Stockholders' Agreement, dated as of May 10, 2018, among certain Apollo Funds, certain Riverstone Funds and the Company (the "Stockholders' Agreement"), the Apollo Funds and the Riverstone Funds may acquire additional shares of our common stock without the approval of the Company Independent Directors.

Through their ownership of a majority of our voting power and the provisions set forth in our charter, bylaws and the Stockholders' Agreement, the Apollo Funds and the Riverstone Funds have the ability to designate and elect a majority of our directors. As a result of the Apollo Funds' and the Riverstone Funds' ownership of a majority of the voting power of our common stock, we are a "controlled company" as defined in [NYSE] listing rules and, therefore, we are not be [sic] subject to NYSE requirements that would otherwise require us to have (i) a majority of independent directors, (ii) a nominating committee composed solely of independent directors, (iii) director nominees selected, or recommended for the board's selection, either by a majority of the independent directors or a nominating committee composed solely of independent directors, and (iv) the compensation of our executive officers determined by a majority of the independent directors or a compensation committee composed solely of independent directors. Under the Stockholders' Agreement, our board of directors has five directors not designated by the Apollo Funds and the Riverstone Funds and five directors designated by the Apollo Funds and the Riverstone Funds.[12]

### 3. Talos's Post-Combination Board

At the time of the Challenged Transaction, and at the time this lawsuit was filed, the Board had ten members, all of whom are defendants in this action: Duncan,

---

[12] Hymes Decl. Ex. 25 at 12–13. Plaintiff points out, and Defendants do not dispute, that the Stockholders' Agreement here actually permits Riverstone and Apollo to together appoint six members of the Company's Board, including Duncan.

Neal Goldman, Christine Hommes, John Juneau, Donald Kendall, Jr., Rajen Mahagaokar, Charles Sledge, Robert Tichio, James Trimble, and Olivia Wassenaar (together, the "Director Defendants"). Three directors, Mahagaokar, Tichio and Wassenaar were recused from considering the Challenged Transaction due to their connection with Riverstone and Riverstone's affiliation with the sellers in the Challenged Transaction (the "Recused Directors"). Mahagaokar and Tichio are Riverstone's designees on the Board. Both are Riverstone insiders: the Complaint describes Mahagaokar as a "principal" and Tichio as a "partner."[13] Both were recused from discussions on the Challenged Transaction, given their status as Riverstone fiduciaries. Wassenaar is one of Apollo's two designees on the Board. She is a senior partner at Apollo, which she joined in 2018 after serving as a managing director at Riverstone. She continues to own an interest in a Riverstone affiliate and so was also recused from discussions on the Challenged Transaction.

Beyond the three Recused Directors, there are seven remaining Director Defendants. Four Director Defendants—Goldman, Sledge, Trimble, and Juneau— are former Stone Energy directors (the "Stone Energy Directors"). The three remaining Director Defendants are Duncan, Kendall, and Hommes. Duncan and Kendall are designated to the Board jointly by Apollo and Riverstone. Hommes is

---

[13] Compl. ¶¶ 28, 30. The Complaint goes on to also describe Tichio as a "principal." *Id.* ¶ 162(h).

8

an Apollo partner and Board designee. Plaintiff alleges some experiential ties between the directors, which I discuss below as they become relevant.

### B. Pre-Challenged-Transaction Ties Between The Venture Capital Defendants

After they invested in Old Talos in 2012, the Venture Capital Defendants crossed in a 2013 energy-sector transaction. In 2013, Apollo led a buyout group including Riverstone that bought nonparty EP Energy Corp. ("EP Energy") for approximately $7.2 billion. In that transaction, Apollo and Riverstone together held 68.95% of EP Energy's stock; and, through a stockholders' agreement, they designated seven of EP Energy's eleven directors, including Beard, Tichio, and Mahagaokar. In 2019, EP Energy filed for bankruptcy. Apollo lost over $2 billion as a result; Riverstone lost over $600 million.

The Complaint also describes Talos's 2018 acquisition of Whistler Energy II, LLC ("Whistler"). Whistler was another oil company that held assets in the Gulf of Mexico. In July 2013 and October 2014, Apollo loaned Whistler a total of $135 million in secured financing. Whistler suffered several operational issues, and in March 2019, several creditors commenced involuntary bankruptcy proceedings against it. Apollo asserted senior secured creditor claims of approximately $143.7 million. Whistler emerged from bankruptcy in March 2018. Apollo had received only $35 million in cash on its loans, but also received new membership interests

that would entitle it to receive 100% of any distributions until it was paid back on its original loans, interest, and fees.

On August 31, Talos acquired Whistler from Apollo for $52.3 million, allegedly making Apollo nearly whole on its Whistler investment.[14] But this came at a price: according to the Complaint, "[m]aking Apollo whole required Talos to greatly overpay for Whistler,"[15] at a premium of between 61% and 66% over a fair price.

According to the Complaint, that transaction "bailed Apollo out of a disastrous investment" and was the first half of the alleged *quid pro quo* at the heart of this action, to be followed by the overpayment for Riverstone assets in the Challenged Transaction.[16] The Complaint alleges that "[h]aving **agreed to let Talos bail out Apollo** from the Whistler debacle, Riverstone **was rewarded** with its own sweetheart deal in the Controllers' next interested-party transaction—the Challenged Transaction."[17] The Complaint offers no other allegations that

___

[14] *See id.* ¶ 55 ("On August 31, 2018, Talos acquired Whistler from Apollo for $52.3 million (including the assumption of $23.8 million in liabilities). The consideration also included the release of $46 million of cash collateral securing Whistler's surety bonds, for a total value to Apollo of $98.3 million. Together with the $35 million that Apollo received from the bankruptcy, this made Apollo nearly whole on its $135 million Whistler investment.").

[15] *Id.* ¶ 56.

[16] *Id.* ¶ 43.

[17] *Id.* ¶ 58 (emphasis added); *see also id.* ¶¶ 4–5 ("First, the controllers caused Talos to buy Whistler, a failing energy company owned by Apollo, at an inflated price that was designed to let Apollo recoup its substantial losses on this troubled investment. Apollo then returned

Riverstone was involved in the Whistler transaction, or that it struck any agreement with Apollo to support the Whistler deal in exchange for a future favor.

## C.     The Challenged Transaction

On December 10, 2019, Talos announced that it had entered into agreements to acquire a portfolio of U.S. Gulf of Mexico oil-producing assets, prospects and acreage from non-parties Castex Energy 2014, LLC, ILX Holdings, LLC, and their affiliates (together, "Sellers").  Sellers are affiliated with Riverstone.  The arrangement between Talos and Sellers would ultimately become the Challenged Transaction at issue here.

Based on an "extensive valuation analysis" in the Complaint, Plaintiff alleges that Talos "grossly overpaid" in the Challenged Transaction, giving Riverstone an unfair windfall.[18]  Plaintiff alleges the Challenged Transaction is the second half of the *quid pro quo* between the Venture Capital Defendants, in which Talos overpaid for a Riverstone asset to make up for Talos overpaying Apollo in the Whistler transaction.  To support this claim, the Complaint describes the evolution of the Challenged Transaction's terms, and then devotes substantial space to criticize the Challenged Transaction's fairness.

---

the 'favor' by agreeing for Talos to buy assets from Riverstone at an inflated price, giving Riverstone a windfall.").

[18] *Id.* ¶ 8.

### 1. The Challenged Transaction's Evolving Terms

Despite the benefit of books and records, the Complaint offers few details on the process leading up to the Challenged Transaction. It appears the Board was responsible for negotiating the terms of the Challenged Transaction in the first instance.[19] Because Sellers were known Riverstone affiliates, the Recused Directors did not participate in Board meetings discussing the Challenged Transaction and did not vote on it. The rest of the Board discussed the Challenged Transaction several times in late 2019.[20] Andrew Wilson, a Riverstone representative, attended all these meetings, and the minutes do not indicate that he left the room while the Board discussed the Challenged Transaction.[21] Jerry Chen, an Apollo representative, also attended, though neither Chen nor Wilson appear to have spoken.[22] Representatives

---

[19] *See, e.g.*, *id.* ¶ 83 ("the Board failed to assess"); *id.* ¶ 84 ("the Board failed to obtain"); *id.* ¶ 87 (same); *id.* ¶ 88 ("the Board deliberately did not submit the Challenged Transaction to a vote"); *id.* ¶ 89 ("the Board did not take steps to confirm").

[20] *See* Hymes Decl. Ex. 11 (outlining Board minutes from an October 4 meeting); Hymes Decl. Ex. 12 (outlining Board minutes from an October 22 meeting); Hymes Decl. Ex. 13 (outlining Board minutes from an October 29 meeting); Hymes Decl. Ex. 14 (outlining Board minutes from a December 6 meeting).

[21] *See* Hymes Decl. Ex. 11 at TAL0000001; Hymes Decl. Ex. 12 at TAL0000576; Hymes Decl. Ex. 13 at TAL0000005; Hymes Decl. Ex. 14 at TAL0000009; Compl. ¶ 65; *see also infra* notes 36–40 and accompanying text (relying on these exhibits rather than board minutes amended and produced after litigation began).

[22] *See generally* Hymes Decl. Ex. 11; Hymes Decl. Ex. 12; Hymes Decl. Ex. 13; Hymes Decl. Ex. 14. The only mention of Wilson in these minutes is to include his name in the list of attendees. Chen was similarly only mentioned in the attendees list, except for in the October 4 meeting minutes, which note that he dropped from the call when Goldman announced the Board would begin discussing "the proposed transaction with Riverstone." Hymes Decl. Ex. 11 at TAL0000002.

from Talos's financial advisor, Defendant Guggenheim Securities, LLC ("Guggenheim"), and its legal advisor, Vinson & Elkins LLP, also attended.[23] Plaintiff alleges Apollo affiliates had retained Guggenheim to advise on three unrelated transactions. Plaintiff casts this as a conflict, notes that the Board did not discuss this conflict, and alleges Guggenheim's fairness opinion (the "Fairness Opinion") was tainted as a result. After negotiating the Challenged Transaction, and with another potential bidder apparently in the mix,[24] the Board unanimously approved the Challenged Transaction on December 6.[25]

Under the Challenged Transaction's original terms, Sellers would receive $385 million in cash, plus 11 million new shares of Talos common stock, which was worth approximately $691 million at the time. Talos's January 30, 2020 Form PREM 14C disclosed those terms to Talos's shareholders. According to Plaintiff,

---

[23] *See* Hymes Decl. Ex. 11 at TAL0000001; Hymes Decl. Ex. 12 at TAL0000576; Hymes Decl. Ex. 13 at TAL0000005; Hymes Decl. Ex. 14 at TAL0000009.

[24] *See* Compl. ¶ 89 ("[D]espite being informed by defendant Duncan of another company's interest in [buying the Seller's assets], the Board did not take steps to confirm the existence of a *bona fide* competing bidder or consider how much a competing bidder might have been willing to pay. Instead, the Board accepted, without question, the existence of the competing bidder and that competing with them to acquire the target assets reduces Talos leverage. . . . The Section 220 documents produced by the Company confirm the Board's failure to take steps to confirm the existence of a *bona fide* competing bidder." (alterations and internal quotation marks omitted)).

[25] *See* Hymes Decl. Ex. 14 at TAL0000014.

NYSE rules required approval by a majority of the common stockholders to issue the 11 million shares of common stock.[26]

Sometime after these initial terms were set, the Challenged Transaction changed course. Instead of compensating Sellers with 11 million shares of Talos common stock, the Company would instead issue 110,000 shares of new Series A Convertible Preferred Stock. Each share of preferred stock would thereafter automatically convert into 100 shares of common stock twenty calendar days after the Challenged Transaction closed (the "Conversion"). There was no Board meeting discussing, or resolution approving, the changing of these terms.

According to Plaintiff, this change had two primary benefits. First, it allowed the Challenged Transaction to close twenty days earlier because the majority of the common stockholders no longer needed to approve the issuance of preferred stock; rather, they would only be asked to approve the Conversion.[27] Second, and relatedly, Riverstone and Apollo could effectuate the approval of that Conversion "without the need for a stockholder vote," thus "depriv[ing] the Company's non-controlling

---

[26] *See* Compl. ¶ 69 ("The change from paying the Sellers 11 million shares of common stock to 110,000 shares of preferred stock allowed the Challenged Transaction to close [twenty] days earlier because, while Rules 312.03(b) and 312.03(c) of the New York Stock Exchange Listed Company Manual required approval by a majority of the common stockholders to issue the 11 million shares of common stock contemplated in the [original transaction], the *issuance* of 110,000 shares of preferred stock contemplated in the [changed transaction] did not; only the *conversion* required such approval.").

[27] *See id.*

14

stockholders of the opportunity to object, or to seek to enjoin the Challenged Transaction."[28]  Riverstone and Apollo did so via a joint written consent dated February 24 (the "Written Consent").[29]  With the Written Consent in hand, the Company filed a revised information statement the next day disclosing the new terms.  On this basis, Plaintiff alleges "the Board deliberately did not submit the Challenged Transaction to a vote of the Company's public stockholders, but instead allowed it to be approved by written consents from Apollo and Riverstone."[30]

The Challenged Transaction closed shortly thereafter, on February 28.  On March 10, Talos issued a revised Information Statement Form PRER 14-C.[31]  This filing presented the Challenged Transaction as complete, noting that the

---

[28] *Id.* ¶¶ 71–72.  It is not immediately apparent to me why subjecting the Challenged Transaction to a stockholder vote would have given minority stockholders more of a voice, given that the Venture Capital Defendants control a majority of the Company's stock, and could have carried the vote without minority input.  Under the Company's Amended and Restated Certificate of Incorporation, stockholders "may consent to any action required or permitted to be taken at any annual or special meeting" using written consents, subject to 8 *Del. C.* § 228.  *See* Hymes Decl. Ex. 2 § 6.1.

[29] *See* Hymes Decl. Ex. 16. When they executed the Written Consent, Riverstone and Apollo also approved certain amendments to the "Registration Rights Agreement" and the Stockholders' Agreement, by which the stock Sellers received would count on a fully converted basis toward Riverstone's ownership percentage for purposes of appointing directors, but excluded for NYSE controlled company rubrics.

[30] Compl. ¶ 88.

[31] Hymes Decl. Ex. 5.

15

stockholders need not approve it because Riverstone and Apollo (referred to by the defined term "Majority Stockholders") already had.[32]

Because the Challenged Transaction issued Talos stock to a Riverstone affiliate, Riverstone's Talos holdings were substantially increased: from 27.5% to 39.8%. Other stockholders, including Apollo, saw a dilution of their shares.

### 2. The Challenged Transaction's Price

Plaintiff devotes over a third of his Complaint to detailing why he believes the Challenged Transaction was unfair to Talos and its minority stockholders.[33] The majority of this discussion is focused on alleged defects in Guggenheim's Fairness Opinion, presenting a "technical valuation analysis" on the Challenged Transaction.[34] The Fairness Opinion evaluated the Challenged Transaction in part by drawing comparisons between Talos, Sellers, and other comparable companies. According to Plaintiff, Guggenheim failed to draw these comparisons systematically, employing a flawed valuation method that consistently undervalued Talos and overvalued the Sellers' assets. These valuation discrepancies were animated in part by the differences between the value of oil and natural gas, causing Guggenheim to overvalue Sellers' gas-skewed reserves and undervalue Talos's oil-

---

[32] *E.g.*, *id.* at 5, 16.

[33] *See generally* Compl. ¶¶ 80–148.

[34] D.I. 48 at 6; *see* Compl. ¶¶ 91–148.

16

heavy reserves.  The Fairness Opinion also did not account for one of Talos's main Mexican oil assets, known as the Zama field.  Plaintiff alleges that had Guggenheim considered Zama, its Fairness Opinion could not have supported the Challenged Transaction.  Based on these and other deficiencies, Plaintiff concludes the Challenged Transaction was unfair to the Company and its minority stockholders. Plaintiff repeatedly alleges these problems were obvious and "could not have been overlooked by persons knowledgeable in the energy industry."[35]

### D.    Plaintiff Seeks Books And Records.

Motivated by problems in the Fairness Opinion, Plaintiff served the Board with a demand to inspect Talos's books and records pursuant to 8 *Del. C.* § 220 on March 31, 2020.[36]  The parties did not litigate Plaintiff's demand and agreed to a

---

[35] Compl. ¶ 118; *see id.* ¶ 100; *see also id.* ¶ 64 ("Although Guggenheim's fairness opinion found that the consideration payable to the Sellers was fair to the Company, its opinion was fatally flawed for the reasons in ¶¶ 91-148, *infra*.  Many of these flaws should have been obvious to the defendants, and particularly as persons experienced in the oil and gas business."); *id.* ¶ 91 ("The Challenged Transaction was also unfair to Talos because it was caused to overpay for the [Sellers' assets] – and defendants had to have been aware of that fact."); *id.* ¶ 102 ("By comparing the [Sellers' assets] to firms that expected production growth, Guggenheim significantly overvalued them – and it had to have known it."); *id.* ¶ 137 ("The need to consider AROs in calculating the value of an asset is well known to petroleum industry professionals like defendants.  Guggenheim failed to do so."); *id.* ¶¶ 146–47 ("These failures should have been obvious to defendants, all of whom are experienced in the petroleum industry, and cannot be the product of negligence.  Had Guggenheim properly examined the Challenged Transaction, it could not have opined that it was fair to the Company.  Rather, it would have been forced to conclude that the Challenged Transaction resulted in Talos overpaying for [Sellers' assets] by hundreds of millions of dollars.  This is unfair to the Company on its face.").

[36] *See* Hymes Decl. Ex. 7 at 1.

stipulated production on May 14.[37] The parties memorialized that production with a "Confidentiality and Non-Disclosure Agreement," which included the following incorporation by reference provision:

> Incorporation Into Complaint. The Stockholder agrees that the complaint in any lawsuit that it files, including but not limited to any derivative lawsuit pursuant to Delaware Court of Chancery Rule 23.1, relating to, involving or in connection with the Demand or any books and records produced in connection therewith, including but not limited to any Confidential Information, shall be deemed to incorporate by reference the entirety of the books and records of which inspection is permitted.[38]

After Plaintiff filed his complaint, the Company produced other documents it claims are responsive to Plaintiff's Section 220 demand.[39] It has also brought forward "amended" Board minutes that are inconsistent with those the Company produced to Plaintiff earlier.[40] In making plaintiff-friendly inferences at this stage, I have relied only on Plaintiff's allegations as framed by the Board minutes and other documents the Company produced to the Plaintiff before he filed his Complaint.

---

[37] *See id.* at 8.

[38] *Id.* § 8(i).

[39] *See* D.I. 57.

[40] *See* D.I. 57; D.I. 60. In particular, those amendments remove Riverstone's representative, Wilson, from attendance at the Board meetings involving the Challenged Transaction.

### E. Plaintiff Files This Action.

On May 29, Plaintiff filed his derivative and class action Complaint.[41] The Complaint asserts seven counts. Counts I and IV allege the Director Defendants breached their fiduciary duties by consummating the Challenged Transaction. Count I is direct and Count IV is derivative. Counts II and V allege the Venture Capital Defendants breached their fiduciary duties as controlling stockholders. Count II is direct and Count V is derivative. Counts III and VI allege Guggenheim aided and abetted the Director Defendants' breaches of fiduciary duty. Count III is direct and Count VI is derivative. Count VII alleges Riverstone was unjustly enriched by the Challenged Transaction, a claim Plaintiff brings derivatively.

On August 8, Defendants filed four motions to dismiss the Complaint under Court of Chancery Rule 12(b)(6) (the "Motions").[42] The parties fully briefed the Motions and the Court heard oral argument on February 19, 2021.[43]

Plaintiff originally named only Riverstone Parent and Apollo Parent as defendants, despite admitting these entities do not own any Talos stock. On May 17, I issued a letter opinion concluding that because the Complaint sought to impose fiduciary duties on the absent Riverstone Funds and Apollo Funds, the Court could

---

[41] *See generally* Compl.

[42] D.I. 24; D.I. 25; D.I. 27; D.I. 28.

[43] D.I. 73; D.I. 76 [hereinafter "Hr'g Tr."].

19

not afford complete relief among the parties currently before it under Rule 19.[44]  I held the Motions in abeyance until the parties joined the relevant Apollo Funds and Riverstone Funds, which they did by stipulation on June 7.[45]  The Apollo Funds and Riverstone Funds declined to present any additional briefing.

Earlier this afternoon, Plaintiff filed a stipulation voluntarily dismissing his direct claims in Counts I, II, and III.[46]  This opinion therefore addresses only his derivative claims in Counts IV, V, VI, and VII.

## II.    ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[47]

---

[44] D.I. 77; *Patel v. Duncan*, 2021 WL 2144855 (Del. Ch. May 17, 2021).

[45] D.I. 81.

[46] D.I. 82.

[47] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted); *accord In re Baker Hughes Inc. Merger Litig.*, 2020 WL 6281427, at *5 (Del. Ch. Oct. 27, 2020).

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[48] This standard is "minimal"[49] and "plaintiff-friendly."[50] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[51] Despite this forgiving standard, the Court need not "accept conclusory allegations unsupported by specific facts" or "draw unreasonable inferences in favor of the non-moving party."[52] "Moreover, the court is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[53]

Plaintiff complains that Talos's fiduciaries caused the Company to engage in the Challenged Transaction via an unfair process[54] and at an unfair price.[55] To properly position that claim before the Court, Plaintiff relies on his theory that the Challenged Transaction is subject to entire fairness review because of the presence

---

[48] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[49] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[50] *See, e.g.*, *Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *9 (Del. Ch. July 24, 2009).

[51] *Cent. Mortg.*, 27 A.3d at 536.

[52] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[53] *Trados*, 2009 WL 2225958, at *4 (internal quotation marks omitted) (quoting *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006)).

[54] *E.g.*, Compl. ¶¶ 80–90, 166, 184–85.

[55] *E.g.*, *id.* ¶¶ 91–148, 166, 184–85.

of a conflicted control group. Plaintiff does not focus on any particular wrongdoing by a fiduciary. He instead builds a theory of liability on the fact of overpayment, inferring that overpayment to Riverstone must have been the result of Riverstone partnering with Apollo to implement a *quid pro quo*.[56] But even with the benefit of plaintiff-friendly inferences on a fact-specific inquiry, Plaintiff has failed to plead that the Venture Capital Defendants are a control group. Accordingly, the Challenged Transaction is presumptively subject to the business judgment rule's deference.

Stripped of the presence of a control group, it is unclear what breach of fiduciary duty Plaintiff asserts to rebut the business judgment rule. Plaintiff does not go so far as to allege waste.[57] But even assuming Plaintiff has fairly pled derivative breaches of the duties of loyalty or care, Plaintiff has failed to allege demand futility for those claims.

### A. Plaintiff Fails To Plead The Venture Capital Defendants Formed A Control Group.

Plaintiff's theory that the Venture Capital Defendants formed a control group is the central feature in the Complaint. The viability of this theory informs the

---

[56] *See* Hr'g Tr. 127–129.

[57] *See generally* Compl.; D.I. 48. At argument, Plaintiff's counsel repeatedly characterized his breach of fiduciary duty claims as "waste," despite acknowledging that this characterization is absent from the complaint and his brief. *See, e.g.*, Hr'g Tr. 137–138.

standard of review, the availability of breach of fiduciary duty claims against the Venture Capital Defendants, and the number of Board members that may be considered interested in the Challenged Transaction.

"Delaware law imposes fiduciary duties on those who effectively control a corporation."[58] The premise for contending that a controller owes fiduciary duties "is that the controller exerts its will over the enterprise in the manner of the board itself."[59] If a controller or control group is present, entire fairness review arises "when the board labors under actual conflicts of interest" stemming from the controller standing on both sides of a challenged transaction or competing with the minority for consideration.[60]

The controller analysis "must take into account whether the stockholder, as a practical matter, possesses a combination of stock voting power and managerial

---

[58] *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020) (internal quotation marks omitted) (quoting *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 102 A.3d 155, 183–84 (Del. Ch. 2014), and citing *S. Pac. Co. v. Bogert*, 250 U.S. 483, 487–88 (1919)).

[59] *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006).

[60] *FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *20 (Del. Ch. Mar. 11, 2019) (quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)), and citing *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997), and *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994), and *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983), and *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009), and *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *12 n.57 (Del. Ch. Mar. 6, 2012), and also citing *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 487 (Del. Ch. 2013)).

authority that enables him to control the corporation, if he so wishes."[61] "The question whether a shareholder is a controlling one is highly contextualized and is difficult to resolve based solely on the complaint."[62] "[T]here is no magic formula to find control; rather, it is a highly fact specific inquiry."[63]

To plead a control group, the plaintiff must first plead the connection among the purported members was "legally significant."[64] Plaintiff must then allege that the control group exercised *de facto* control by actual domination or control of the board generally, or actual domination or control of the corporation, its board, or the deciding committee with respect to the challenged transaction.[65] In *Garfield v. BlackRock Mortgage Ventures*, then-Vice Chancellor McCormick helpfully framed the pleading stage inquiry as two questions: (1) whether the alleged control group was indeed a group, and (2) whether the alleged control group exercised sufficient

[61] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003).

[62] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *6 (Del. Ch. June 5, 2006); *accord In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *13 (Del. Ch. Mar. 28, 2018) ("Whether a large blockholder is so powerful as to have obtained the status of a 'controlling stockholder' is intensely factual and it is a difficult question to resolve on the pleadings." (alterations and internal quotation marks omitted)); *Cysive*, 836 A.2d at 550–51 (same).

[63] *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (citing *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014)).

[64] *Sheldon v. Pinto Tech. Ventures, L.P.* (*Sheldon II*), 220 A.3d 245, 251–52 (Del. 2019), *aff'g Sheldon v. Pinto Tech. Ventures, L.P.* (*Sheldon I*), 2019 WL 336985, at *9 (Del. Ch. Jan. 25, 2019).

[65] *See FrontFour*, 2019 WL 1313408, at *22.

control.[66]  The critical question here is the first one:  whether Plaintiffs sufficiently plead the Venture Capital Defendants formed a group.  If bound as a group, the Venture Capital Defendants owned more than 50% of Talos's outstanding shares and so would be a control group owing fiduciary duties.[67]

The Delaware Supreme Court recently addressed the requirements for pleading a control group in *Sheldon v. Pinto Technology Ventures, L.P.* (*Sheldon II*), adopting the "legally significant connection" standard applied by multiple decisions of this Court:

> To demonstrate that a group of stockholders exercises control collectively, the [plaintiff] must establish that they are connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal.  To show a legally significant connection, the [plaintiff] must allege that there was more than a mere concurrence of self-interest among certain stockholders.  Rather, there must be some indication of an actual agreement, although it need not be formal or written.[68]

---

[66] 2019 WL 7168004, at *8 (Del. Ch. Dec. 20, 2019).

[67] *See In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) ("[T]he Delaware Supreme Court described two scenarios in which a stockholder could be found a controller under Delaware law:  where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but exercises control over the business affairs of the corporation." (internal quotation marks omitted) (quoting *Lynch*, 638 A.2d at 1113–14), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015); Compl. ¶ 14 (alleging "Apollo and Riverstone respectively owned 35.4% and 27.5% (a total of 62.9%) of the Company's stock" before the Challenged Transaction).

[68] 220 A.3d at 251–52 (footnotes and internal quotation marks omitted) (quoting *Crimson Expl.*, 2014 WL 5449419, at *15, and *Carr v. New Enter. Assocs. Inc.*, 2018 WL 1472336, at *10 (Del. Ch. Mar. 26, 2018)).

While the plaintiff-friendly pleading standard and fact-intensive nature of the control group inquiry loom large at this stage, these concerns do not require the Court to "pile up questionable inferences until such a conclusion is reached."[69]

Plaintiff relies heavily on *Garfield*, which built on the "playbook" outlined in *In re Hansen Medical Shareholders Litigation*.[70] The plaintiffs in those cases succeeded in pleading a control group because they went beyond alleging mere parallel interests, and pointed to "an array of plus factors" like historical ties and transaction-specific ties that support a reasonable inference of an actual agreement.[71] Together, those cases stand for the proposition that a combination of "voting power, concurrence of interests, historical ties, and transaction-specific coordination" can "give rise to a reasonably conceivable inference" that an alleged control group struck

---

[69] *Crimson Expl.*, 2014 WL 5449419, at *15.

[70] 2018 WL 3025525 (Del. Ch. June 18, 2018).

[71] *Id.* at *6 ("Although parallel interests alone are insufficient as a matter of law to support the inference that the shareholders were part of a control group, parallel interests, in addition to other facts alleged by plaintiffs, can support a reasonable, but not necessarily conclusive, inference that a control group existed." (alterations and internal quotation marks omitted) (quoting *Zimmerman v. Crothall*, 2012 WL 707238, at *11 (Del. Ch. Mar. 27, 2012))); *Garfield*, 2019 WL 7168004, at *9 (discussing *Hansen* and noting that "an array of plus factors" beyond a "mere concurrence of self-interest" could "allow[] the Court to infer some indication of an actual agreement." (internal quotation marks omitted) (quoting *Sheldon II*, 220 A.3d at 252)).

an "actual agreement to work together in connection with" a challenged transaction.[72]

Plaintiff attempts the same path here. His brief points to four factors that he argues support an inference that the Venture Capital Defendants formed a control group: (1) their historical relationship, including Beard's roles at both funds, the funds' investments in Old Talos, Talos's purchase of Whistler, and the EP Energy transaction; (2) the Company's "admission" that it is "controlled by Apollo Funds and Riverstone Funds" in its September 2018 registration statement; (3) the Stockholders' Agreement, permitting the Venture Capital Defendants to appoint a majority of the Board's directors, and (4) that representatives from Riverstone and Apollo attended the meetings where the Board discussed the Challenged Transaction.[73]

I begin with the Venture Capital Defendants' historical relationship, as compared to those between the alleged controllers in *Hansen* and *Garfield*, on which Plaintiff relies. In *Hansen*, the plaintiff alleged extensive historical ties between the alleged controllers, including: their "long history of cooperation and coordination" spanning "almost a quarter of a century"; their twenty-one year history of

---

[72] *Garfield*, 2019 WL 7168004, at *10 (internal quotation marks omitted) (citing *Hansen*, 2018 WL 3025525).

[73] *See* D.I. 48 at 22–27.

"coordinating their investment strategy in at least seven different companies"; their self-designation as a "group" in SEC filings unrelated to the company; their involvement as the only participants in a private placement which made them the company's largest shareholders; and the company's grouping of them in several related documents.[74] *Garfield* similarly involved extensive historical ties between the alleged controllers, including their "ten-year history of co-investment" in the company, which they "decided to start . . . together as the Company's founding sponsors," and the company's repeated use of defined terms to interchangeably and collectively refer to the two entities in its LLC agreement and a litany of public filings.[75]

The historical ties between the Venture Capital Defendants here are weaker. Outside of Talos, the Venture Capital Defendants are alleged to have crossed paths only once, in the EP Energy transaction. Allegations that "venture capital firms in the same sector crossed paths in a few investments" are insufficient to show the "long history of cooperation and coordination" this Court found significant in *Hansen*.[76]

---

[74] 2018 WL 3025525, at *7.

[75] 2019 WL 7168004, at *9.

[76] *Sheldon I*, 2019 WL 336985, at *9 (quoting *Hansen*, 2018 WL 3030808, at *7).

28

Within Talos, the Venture Capital Defendants' sustained relationship is significant. Their common principal Beard and Riverstone's co-founders orchestrated their takeover of Old Talos, from which they received advisory and transaction fees. After the Combination with Stone Energy, the Venture Capital Defendants' Stockholders' Agreement enabled their nominees to make up a majority of the Board.[77]

The Stockholders' Agreement also led Talos to disclose it is a "controlled company" under NYSE rules. A company's public description of investors as a powerful unitary group in public filings, like "strategic investors" or "sponsor members," contribute to the "plus factors" supporting the presence of a control group.[78] While Talos's disclosure is relevant, it is important to understand it in context. Section 303A.00 of the NYSE's Listed Company Manual defines a "controlled company" as:

> A listed company of which more than 50% of the voting power for the election of directors is held by an individual, a group or another company is not required to comply with the requirements of Sections 303A.01, 303A.04 or 303A.05. Controlled companies must comply with the remaining provisions of Section 303A.[79]

---

[77] *See* Hymes Decl. Ex. 6 § 3.1(a).

[78] *Garfield*, 2019 WL 7168004, at *9; *see also Hansen*, 2018 WL 3025525, at *7 (noting that the alleged controllers "declared themselves to the SEC as a 'group' of stockholders" in public filings).

[79] N.Y. Stock Exchange, *Listed Company Manual* § 303A.00 (2018), *available at* https://nyse.wolterskluwer.cloud/listed-company-manual; *see also* Hymes Decl. Ex. 25 at 118 ("Under NYSE rules, a 'controlled company' is defined as a listed company of which more than 50% of the voting power for the election of directors is held by an

In compliance with this rule, Talos's September 2018 registration statement indicated Talos is "controlled by Apollo Funds and Riverstone Funds."[80] Talos explained this was based on the Stockholders' Agreement and the Venture Capital Defendants' voting power:

> Through their ownership of a majority of our voting power and the provisions set forth in our charter, bylaws and the Stockholders' Agreement, the Apollo Funds and the Riverstone Funds have the ability to designate and elect a majority of our directors. As a result of the Apollo Funds' and the Riverstone Funds' ownership of a majority of the voting power of our common stock, we are a "controlled company" as defined in [NYSE] listing rules and, therefore, we are not be [sic] subject to [certain NYSE requirements].[81]

This NYSE-compelled disclosure is not as strong as the repeated public statements that supported the outcome in *Garfield*,[82] or the self-designation the alleged

---

individual, a group, or another company. The Company is a controlled company within the meaning of NYSE rules.").

[80] Hymes Decl. Ex. 25 at 12.

[81] *Id.*

[82] *See* 2019 WL 7168004, at *9 ("From inception, the LLC Agreement has referred to BlackRock and HC Partners interchangeably and as 'Sponsor Members.' Documents filed in connection with the Public REIT IPO one year after the founding of PennyMac refer to the two entities as 'strategic investors.' The Up-C public offering documents filed four years later also continue to describe BlackRock and HC Partners as 'strategic partners.' Plaintiff further alleges that subsequent public disclosures continued to use the same joint nomenclature with respect to BlackRock and HC Partners. Just as in *Hansen*, Plaintiff has alleged a multi-year history of co-investment between group members that was identified and recognized by the Company as well as the group itself in public disclosures." (footnotes omitted)).

controllers themselves made in *Hansen*.[83] While the Venture Capital Defendants'

historical and company ties are weaker than those in *Hansen* and *Garfield*, they still

offer a nondispositive "backdrop" against which to consider transaction-specific

ties.[84]

Turning to transaction-specific ties, Plaintiff begins with the Stockholders'

Agreement. But that agreement deals only with the election of directors and does

not bind the Venture Capital Defendants as to the Challenged Transaction. In

*Sheldon II*, the Delaware Supreme Court affirmed that a similar voting agreement,

which "did not bear on the [challenged transaction] or bind the [alleged control group

members] beyond selecting directors," did not represent a legally significant

connection to work toward a shared goal.[85] *Sheldon II* built on *van der Fluit v. Yates*,

in which this Court found that the alleged controllers' "Investor Rights Agreement"

fell short because it contained "no voting, decision-making, or other agreements that

---

[83] *See* 2018 WL 3025525, at *7 ("[The alleged controllers'] history began almost a quarter of a century ago when they entered into a voting agreement and declared themselves to the SEC as a 'group' of stockholders in Quidel."); *see also Sheldon II*, 220 A.3d at 255 (noting "[t]he complaint does not allege that [the alleged controllers] held themselves out as a group of investors or that they reported as such to the SEC").

[84] *See Garfield*, 2019 WL 7168004, at *9 (describing the alleged controllers' historical ties as a "backdrop" for their transaction-specific ties); *see also Hansen*, 2018 WL 3025525, at *7 (discussing the alleged controller's transaction-specific ties "in light of the [their] twenty-one year coordinated investing history").

[85] *See* 220 A.3d at 253–54.

31

bear on the transaction challenged in the instant case."[86] Here, the Stockholders'

Agreement similarly binds the Venture Capital Defendants only to elect certain

directors. Riverstone, Apollo, and the directors they appointed "were free to vote in

their discretion on all other matters," just as in *Sheldon II*.[87] That the director

agreement may warrant disclosure under NYSE rules does not change its

significance under Delaware law.[88] The Stockholders' Agreement, as limited to

---

[86] 2017 WL 5953514, at *6 (Del. Ch. Nov. 30, 2017).

The *van der Fluit* Court also noted that other signatories were parties to the voting agreement and criticized the plaintiff for not offering any "explanation for why [the alleged controllers] are members of an alleged control group while numerous other signatories to these agreements are not." *Id.* The trial court in *Sheldon I* similarly noted this problem. 2019 WL 336985, at *10. When the appellant challenged this conclusion on appeal, the Delaware Supreme Court did not consider this detail and reiterated that the agreement did not implicate the challenged transaction. *Sheldon II*, 220 A.3d at 254 ("Moreover, although the Appellants contend on appeal that the Voting Agreement contractually bound the Venture Capital Firms (and not the other Shareholders) to vote together and designate additional directors, it does not require them to vote together on any transaction and was not implicated in the approval of any of the transactions in connection with the [challenged transaction]." (footnotes, alterations, and internal quotation marks omitted)). While the Stockholders' Agreement here was between only the Venture Capital Defendants, I similarly view that detail as less significant than the fact that it did not bind them with respect to the Challenged Transaction.

[87] *See* 220 A.3d at 255. In fact, as Defendants point out, the Stockholders' Agreement's only effect on the Challenged Transaction is to limit the Venture Capital Defendants from voting in favor of it absent prior approval from the disinterested directors. *See* Hymes Decl. Ex. 6 § 3.6 (prohibiting the Venture Capital Defendants from causing the Company to enter into a "Related Party Transaction" unless it had been approved by a majority of the disinterested directors); *see also id.* § 1.1 (defining a "Related Party Transaction").

[88] *See, e.g.*, *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 61–62 (Del. Ch. 2015) (discussing the differences between the "bright-line rule of disqualification for independence" in the NYSE rules and the "case-by-case fact specific inquiry" into that question under Delaware law and noting "a board's determination of director independence under the NYSE Rules is qualitatively different from, and thus does not operate as a surrogate for, this Court's analysis of independence under Delaware law for demand futility

board appointees, is insufficient to bind the Venture Capital Defendants in a control group.[89]

In search of a transaction-specific connection, Plaintiff also points out that representatives from both Riverstone and Apollo were present at Board meetings discussing the Challenged Transaction.[90] Plaintiff cites no authority to support the conclusion that their mutual presence demonstrates an agreement to work together in a control group.[91] In my view, the fact that two large stockholders sent representatives to Board meetings does not support an inference that they were tied to each other.

These representatives' passive presence at Board meetings discussing the Challenged Transaction stands in stark contrast to the facts in *Hansen* and *Garfield*, where the alleged controllers were deeply involved in negotiating and structuring

---

purposes.”); *see also In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at \*36 & n.35 (Del. Ch. Jan. 25, 2016) (noting “[t]he independence standards established by stock exchanges and the requirements of Delaware law, such that a finding of independence (or its absence) under one source of authority is not determinative for purposes of the other, but the two sources of authority are mutually reinforcing and seek to advance similar goals[,]” and compiling sources (footnote omitted)).

[89] *See, e.g.*, *Sheldon II*, 220 A.3d at 253–54.

[90] *See* D.I. 48 at 24–25.

[91] Plaintiff cites only the statement in *In re Primedia Inc. Derivative Litigation* that “[a]llegations of control over the particular transaction at issue are enough.” 910 A.2d 248, 257 (Del. Ch. 2006). But this statement addresses the extent to which a stockholder or recognized group must exercise “control” to be considered a “controller”; in considering a single controller, *Primedia* did not address whether two or more stockholders formed a control group. *Id.* at 257–58.

33

the challenged transactions. In *Garfield*, for example, the alleged controllers "met jointly" with management to "negotiate the [challenged transaction], granting them preferential review and exclusive weigh-in before the Board had considered the proposal."[92] The *Garfield* plaintiff alleged several other meetings between the decision makers and the alleged controllers, where the controllers participated heavily, management "depicted [the alleged controllers] as belonging to a collective unit," and "treated [the alleged controllers] as a collective unit whose opinion was more of a priority than the Board's."[93] The alleged controllers in *Hansen*, identified by the board as "Key Stockholders," similarly had a preferential and exclusive role in negotiating the challenged transaction.[94] They also contemporaneously executed voting agreements that required them to vote in favor of the transaction.[95] These extensive transaction-specific ties are absent here.[96]

---

[92] 2019 WL 7168004, at *10.

[93] *Id.*

[94] *See* 2018 WL 3025525, at *7.

[95] *See id.*

[96] I note another fact mentioned in the Complaint: that the Venture Capital Defendants jointly executed the Written Consent that approved the Conversion. Plaintiff did not argue the Written Consent suggested an actual agreement between the Venture Capital Defendants, instead, pointing to the Written Consent as evidence of the Challenged Transaction's substantive unfairness. *See* D.I. 48 at 23–27, 37–38; *see also id.* at 79. "Issues not briefed are deemed waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999). I note nevertheless that this Court has been skeptical of such an argument in the past. *See Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *5 (Del. Ch. May 22, 2009); *see also Silverberg v. Padda*, 2019 WL 4566909, at *6 (Del. Ch. Sept. 19, 2019).

And so, to fashion a transaction-specific tie between the Venture Capital Defendants, Plaintiff is left to rely heavily on his theory that the Challenged Transaction was part of an unspoken *quid pro quo* arrangement.[97]  Plaintiff argues that in 2018, Riverstone agreed to let Talos overpay for Whistler to Apollo's benefit and, in exchange, Apollo agreed to support the Challenged Transaction for Riverstone's benefit.  But his Complaint falls short of pleading such an agreement. He does not allege Riverstone had any role in the Whistler deal; he alleges only that Riverstone "agreed to let Talos" consummate it and overpay Apollo.[98]  As to the allegedly compensatory Challenged Transaction, the Complaint only alleges that Apollo supported it, not that it struck any agreement with Riverstone (before or after the Whistler deal).

Plaintiff's bare allegations are similar to those this Court rejected in *Silverberg v. Padda*.[99]  Building on *Dubroff v. Wren Holdings, LLC*,[100] *Silverberg* held the plaintiff failed to sufficiently plead that the company's private equity sponsors formed a control group:

---

[97] *See* D.I. 48 at 25–29.

[98] Compl. ¶ 58.

[99] 2019 WL 4566909.

[100] 2009 WL 1478697.

Plaintiffs argue that the venture capital fund defendants shared an unspoken *quid pro quo*, whereby each of their board representatives approved current offerings in consideration for past or future support from other venture capital funds. But the only facts Plaintiffs allege are that the venture capital funds voted to amend the Certificate of Incorporation or their board representatives[] approved the challenged transactions. Thus, the Second Amended Complaint suffers the same flaw as in *Dubroff* in that it fails to allege that the venture capital funds in this case are connected in a legally significant way relating to voting, decision-making, or other agreements that bear on the transactions at issue in this case. In so doing, it improperly conflates acts of consensus with the act of forming a group.[101]

Plaintiff's allegations here, which similarly conflate the Venture Capital Defendants' "consensus" to the Whistler deal and the Challenged Transaction as "acts of forming a group," fail for the same reasons.[102]

When pressed on these deficiencies at argument, Plaintiff fell back on what has consistently been his primary position: that the Challenged Transaction was so egregiously one-sided that it can only be explained by the presence of a conflicted control group.[103] Despite not alleging a transaction-specific agreement between the

---

[101] 2019 WL 4566909, at *7 (footnotes, alterations, and internal quotation marks omitted) (quoting *van der Fluit*, 2017 WL 5953514, at *5–6).

[102] *See id.*; *see also Crimson Expl.*, 2014 WL 5449419, at *15 ("Basically, Plaintiffs ask the Court to infer that, because ACEC could have (and may have) invested in the Second Lien and, because Oaktree did invest in the Second Lien, Oaktree and ACEC were in cahoots. I decline to pile up questionable inferences until such a conclusion is reached. The simple fact that the interests of two entities are aligned is legally insufficient to establish the existence of a control group." (footnotes omitted)).

[103] *See* Hr'g Tr. 127 ("THE COURT: Before we move past the *quid pro quo*, I want to be sure I understand. What, other than the fact that these transactions happened in the sequence that they did, in the complaint indicates that this was in fact a *quid pro quo*? MR. TEPPER: Well, Your Honor, as Mr. Jenkins described, we submit that the challenged

Venture Capital Defendants, Plaintiff encourages the Court to infer one from the Challenged Transaction's final terms.[104] Counsel conceded Plaintiff's theory has evolved and is now essentially waste, while acknowledging the word "waste" does not appear in the Plaintiff's Complaint or brief.[105] In effect, Plaintiff would have the Court impose fiduciary duties on the Venture Capital Defendants and analyze the Challenged Transaction under the entire fairness standard because, in his view, the Challenged Transaction was not entirely fair. I cannot follow Plaintiff down this circular and hindsight-driven path.

And so, Plaintiff has failed to plead a legally significant agreement between the Venture Capital Defendants to pursue the Challenged Transaction, and so falls

---

transaction, the transaction at issue in this case, is so egregious on its face that it cannot be the product of business judgment. So that gives rise to two inferences, either that the board of directors agreed to a transaction that makes absolutely no economic sense because they were absolutely incompetent -- and we don't think they are incompetent -- or it gives rise to the inference that they did so for another reason, and that reason is the *quid pro quo*.").

[104] *See id.*; *see also id.* 128–129 ("MR. TEPPER: Well, Your Honor, the *quid pro quo* -- again, if the *quid pro quo* is an inference, the transaction, as my colleague discussed, makes no sense. There are just too many mistakes in the valuation in order to be mistakes. It's more consistent with Guggenheim putting its finger on the scales to arrive at a certain valuation. So the question then becomes why was this transaction agreed to? And, certainly, looking back, looking back at the history of Apollo and Riverstone -- we are limited in what we can allege based on what's in the public domain and the 220 documents without discovery, but certainly we have alleged facts consistent with the *quid pro quo* for purposes of the motion to dismiss. . . . But there simply is no other explanation for entering into this unfair transaction other than an agreement or that the board completely dropped the ball. So that is the inference we submit should be taken here. And we submit it's a reasonable inference under the facts and circumstances in the case.").

[105] *See id.* 129, 137–138. *See generally* Compl.; D.I. 48.

short of pleading they formed a control group. As this Court has noted in several cases, including *Hansen*, it is possible to plead a control group despite the failure of any individual factor, or any lesser combination thereof, to carry the day.[106] I have given serious consideration to that possibility here, particularly given this plaintiff-friendly stage and the fact-intensive nature of the control group inquiry. But I cannot reasonably draw the inference Plaintiff seeks. In the end, Plaintiff's most significant pleading deficiency lies in the failure of his *quid pro quo*, the only argument he makes to support a transaction-specific agreement between the Venture Capital Defendants. Though it is true Riverstone and Apollo have coinvested in Talos and crossed paths previously, the absence of any allegation or indication that they struck an agreement to work together, as in *Silverberg*, is fatal to Plaintiff's theory.

**\*\*\***

Plaintiff has not pled that a conflicted control group effectuated the Challenged Transaction. This failure has many consequences. First, Count V, which

---

[106] *See*, 2018 WL 3025525, at \*7 ("Although each of these factors alone, or perhaps even less than all these factors together, would be insufficient to allege a control group existed, all of these factors, when viewed together in light of the Controller Defendants' twenty-one year coordinated investing history, make it reasonably conceivable that the Controller Defendants functioned as a control group during the Merger."); *see also Garfield*, 2019 WL 7168004, at \*11 ("In the end, because the analysis for whether a control group exists is fact intensive, it is particularly difficult to ascertain at the motion to dismiss stage. In this case, the sum-total of the facts alleged and inferences therefrom make it at least reasonably conceivable that BlackRock and HC Partners formed a control group that exercised effective control over PennyMac in connection with the Reorganization." (footnotes, alterations, and internal quotation marks omitted) (quoting *Hansen*, 2018 WL 3025525, at \*6)).

alleges breach of fiduciary duty claims against the Venture Capital Defendants, fails because Plaintiff has failed to allege Riverstone and Apollo were controllers, and thus fiduciaries, of the Company. The Motions are therefore granted with respect to that Count.

Second, and more broadly, the Challenged Transaction is not subject to review under the entire fairness standard, because Riverstone as Sellers' affiliate is not also standing on the buy side as a Talos fiduciary. Plaintiff does not attempt to subject the Challenged Transaction to entire fairness on any other grounds.[107] Accordingly, the Challenged Transaction is presumptively subject to the business judgment rule unless Plaintiff can rebut it. Plaintiff makes little effort in this regard. But even if Plaintiff pled breaches of fiduciary duty, he could not pursue them here because he has not established proper derivative standing.

### B. Plaintiff Lacks Standing To Pursue Derivative Claims.

Counts IV, VI, and VII allege derivative claims for breach of fiduciary duty against the Director Defendants, for aiding and abetting against Guggenheim, and for unjust enrichment against Riverstone. Derivative claims belong to the Company and the decision whether to pursue the claim presumptively lies with the Board.[108]

---

[107] *See* D.I. 48 at 31–34.

[108] *White v. Panic*, 783 A.2d 543, 550 (Del. 2001) ("In most situations, the board of directors has sole authority to initiate or to refrain from initiating legal actions asserting rights held by the corporation."); *see Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of the General Corporation Law of the state of Delaware is that directors,

39

But our law recognizes that, "[i]n certain circumstances, stockholders may pursue litigation derivatively on behalf of the corporation as a matter of equity to redress the conduct of a torpid or unfaithful management . . . where those in control of the company refuse to assert (or are unfit to consider) a claim belonging to it."[109] "Because stockholder derivative suits by [their] very nature . . . impinge on the managerial freedom of directors, our law requires that a stockholder satisfy the threshold demand requirements of Court of Chancery Rule 23.1 before he is permitted to assume control of a claim belonging to the corporation."[110]

Rule 23.1 requires pleadings to "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a)."[111] To meet the Rule 23.1 requirements, the stockholder must plead with particularity either that she made a demand on the company's board of directors to pursue particular claims and was wrongfully refused, or why any such demand would be futile, thereby excusing the need to make

rather than shareholders, manage the business and affairs of the corporation."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[109] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *27 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021) (quoting *Cumming v. Edens*, 2018 WL 992877, at *11 (Del. Ch. Feb. 20, 2018) (internal quotation marks omitted)).

[110] *Horman v. Abney*, 2017 WL 242571, at *6 (Del. Ch. Jan. 19, 2017) (quoting *Aronson*, 473 A.2d at 811) (internal quotation marks omitted).

[111] *Brehm*, 746 A.2d at 254; *accord In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120–21 (Del. Ch. 2009).

a demand altogether.[112]  Where, as here, the stockholder plaintiff foregoes a demand

on the board, she "must plead particularized facts creating a reasonable doubt

concerning the Board's ability to consider the demand."[113]

Demand futility turns on "whether the board that would be addressing the

demand can impartially consider [the demand's] merits without being influenced by

improper considerations."[114]  Historically, Delaware Courts applied one of two tests

in determining whether a Plaintiff met that standard.  The first, established in

*Aronson v. Lewis*, "applie[d] to claims involving a contested transaction *i.e.*, where

it is alleged that the directors made a conscious business decision in breach of their

fiduciary duties."[115]  The second, established in *Rales v. Blasband*,[116] applied where

a majority of the current members of the board "had not participated in the

---

[112] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004); *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

[113] *CBS*, 2021 WL 268779, at *28; *Citigroup*, 964 A.2d at 121 ("Demand is not excused solely because the directors would be deciding to sue themselves.  Rather, demand will be excused based on a possibility of personal director liability only in the rare case when a plaintiff is able to show director conduct that is so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." (footnotes and internal quotation marks omitted)).

[114] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

[115] *Wood*, 953 A.2d at 140 (explaining the two demand futility tests) (citing *Aronson*, 473 A.2d at 814).  Under *Aronson*, the plaintiff must plead particularized facts that create a reasonable doubt that (i) the directors are disinterested and independent or (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. *Id.* at 140.

[116] 634 A.2d at 927.

challenged decision,"[117] or "where the subject of a derivative suit is not a business decision . . . [such as when the board is alleged to have violated its] oversight duties."[118] Last year, in *United Food and Commercial Workers Union v. Zuckerberg* (*Zuckerberg I*), Vice Chancellor Laster called the viability of this binary approach into question, criticizing *Aronson* and applying a three-part "blended" test.[119]

The Defendants filed their opening briefs last year before *Zuckerberg I*, arguing that *Aronson* was the governing test and that Plaintiff failed to meet it.[120] Plaintiff responded, similarly applying *Aronson* only days before *Zuckerberg I* was issued.[121] While the Director Defendants' reply brief discussed *Zuckerberg I*, the parties' claims at oral argument continued to focus on *Aronson*.[122]

The continued viability of this binary approach to demand futility was resolved late last week, when the Delaware Supreme Court affirmed *Zuckerberg I*

---

[117] *Zuckerberg I*, 250 A.3d at 887.

[118] *Wood*, 953 A.2d at 140; *see also Horman*, 2017 WL 242571, at *6 (holding that *Rales* applies "when a plaintiff challenges board inaction such as when a board is alleged to have consciously disregarded its oversight duties").

[119] 250 A.3d 862, 877 (Del. Ch. 2020) (observing that "the *Aronson* test has proved to be comparatively narrow and inflexible in its application, and its formulation has not fared well in the face of subsequent judicial developments").

[120] *See* D.I 27 at 19–32 (arguing "Plaintiff fails to adequately plead either *Aronson* requirement); *see also* D.I. 24 at 2, 9 (incorporating the Director Defendants' argument by reference); D.I. 26 at 22 (same); D.I. 28 at 2 n.1 (same).

[121] *See* D.I. 48 at 61–78.

[122] *See* Hr'g Tr. 19 ("The parties agree *Aronson* applies to demand futility here, so there's no dispute about that.").

in *Zuckerberg II*.[123] In doing so, it adopted *Zuckerberg I*'s "universal test" for determining demand futility under Rule 23.1:

> [F]rom this point forward, courts should ask the following three questions on a director-by-director basis when evaluating allegations of demand futility:
>
> (i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;
>
> (ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and
>
> (iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.
>
> If the answer to any of the questions is "yes" for at least half of the members of the demand board, then demand is excused as futile. It is no longer necessary to determine whether the *Aronson* test or the *Rales* test governs a complaint's demand-futility allegations.[124]

*Zuckerberg*'s three-pronged test blends *Aronson* and *Rales* and is "consistent with and enhances" those cases and their progeny.[125] Because of that continuity, the

---

[123] 2021 WL 4344361.

[124] *Id.* at *17.

[125] *Id.* ("This Court adopts the Court of Chancery's three-part test as the universal test for assessing whether demand should be excused as futile. . . . Blending the *Aronson* test with the *Rales* test is appropriate because both address the same question of whether the board can exercise its business judgment on the corporation's behalf in considering demand; and the refined test does not change the result of demand-futility analysis.") (footnotes, alterations, and internal quotation marks omitted) (quoting *Lenois v. Lawal*, 2017 WL 5289611, at *9 (Del. Ch. Nov. 7, 2017)).

Supreme Court did not directly overrule *Aronson* and "cases properly construing *Aronson*, *Rales*, and their progeny remain good law."[126]

Applying the *Zuckerberg* test to the facts here, I conclude Plaintiff cannot show that at least half the members of the Company's Board were incapable of fairly and impartially considering a litigation demand. Talos's Board has ten members. Defendants concede that the three Recused Directors would have been interested for demand futility purposes.[127] Under *Zuckerberg* prong one, demand would have been futile as to those directors because their affiliation with Riverstone caused them to receive "a material personal benefit from the alleged misconduct that is the subject of the litigation demand."[128] The question is therefore whether the remaining seven directors could have fairly considered a demand. I conclude that at least six could have, and so, Plaintiff cannot show that demand would have been futile for at least half of the Board's ten directors.

I first consider whether any directors stood to receive a material personal benefit from the Challenged Transaction, under what is now conceived as *Zuckerberg*'s first prong, or lacked independence from someone who did, under *Zuckerberg*'s third prong. In advancing his argument that certain Board members

---

[126] *Id.* In light of these similarities, I spared the parties the time and expense of supplemental briefing.

[127] *See* Hr'g Tr. at 18.

[128] *Zuckerberg II*, 2021 WL 4344361, at *17.

44

faced such disabling conflicts, Plaintiff leans heavily on his *quid pro quo* theory, particularly regarding Hommes, one of Apollo's designees, and Kendall, the Venture Capital Defendants' joint designee.[129] Hommes was a partner at Apollo and, thus, certainly shared any interest Apollo had in the Challenged Transaction.[130] But absent Plaintiff's failed *quid pro quo* and control group theories, there is no basis for concluding that Apollo, or Hommes by extension, received any unique benefit from the Challenged Transaction that was not shared by Talos's other stockholders. As for Kendall, he is not alleged to have any ownership stake in Riverstone or Apollo. His status as the Venture Capital Defendants' joint designee does not automatically make him beholden to Riverstone, or otherwise impute Riverstone's conflicts onto him. Delaware law is "well-settled . . . that a director's independence is not compromised simply by virtue of being nominated to the board by an interested stockholder."[131]

---

[129] *See* Compl. ¶¶ 162(c), (e).

[130] *See id.* ¶ 25.

[131] *KKR*, 101 A.3d at 996; *see, e.g.*, *Andreae v. Andreae*, 1992 WL 43924, at *5 (Del. Ch. Mar. 3, 1992) (addressing plaintiff's argument that board members were "beholden to" the company's single voting shareholder who elected them and noting "it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches upon independence. Stated differently, the relevant inquiry is not how the director got his position, but rather how he comports himself in that position." (internal quotation marks omitted) (quoting *Aronson*, 473 A.2d at 816)); *see also Sheldon II*, 220 A.3d at 253 n.38 (compiling sources

None of the Stone Energy Directors (Goldman, Juneau, Sledge, and Trimble) are alleged to have received any unique benefit from the Challenged Transaction, nor does Plaintiff advance such an argument. Instead, he points to ties between them and Duncan, along the lines of *Zuckerberg*'s third prong. Even assuming Duncan, who has deep ties with Riverstone,[132] would be interested under *Zuckerberg* prong one, there are insufficient allegations to suggest any of the Stone Energy Directors lacked independence from him or from one another. Plaintiff's allegations resemble the types of loose social and business ties this Court has repeatedly rejected.

---

that refute the proposition that a director necessarily lacks independence from the stockholder who nominated her); *KKR*, 101 A.3d at 996 n.64 (same).

[132] *See* Compl. ¶ 23 ("Defendant Duncan has been a member of the Board and the Company's President and CEO since the Combination. He was designated to the Board jointly by Apollo and Riverstone, with whom he has a long history. In 2006, Duncan co-founded non-party Phoenix Exploration Co. LP . . . with $350 million in equity commitments from Riverstone and its partners. In 2012, he founded Old Talos with $600 million in equity commitments from Riverstone and Apollo and served as Old Talos'[s] President and CEO and a member of its board from April 2012 until the Combination. When Old Talos was formed, Riverstone's founders [Lapeyre and Leuschen] announced, 'We are excited to build another company with Tim. This investment exemplifies Riverstone's strategy of re-partnering with proven management teams. We look forward to repeating the success we had with Phoenix.'" (alteration omitted)); *see also id.* ¶ 162(a) ("Duncan was designated to the Board jointly by Apollo and Riverstone. He voted in favor of the Challenged Transaction and is alleged to have breached his fiduciary duties as set forth herein. Duncan's 2017 compensation from Old Talos was $1,033,367. His 2018 compensation from Old Talos and the Company was $4,278,604. His 2019 compensation from the Company was $5,617,864. His multi-year, multi-million dollar compensation from the Company would be jeopardized if he were to antagonize the [Venture Capital Defendants]. Moreover, as set forth in the Company's Schedule 14-A filed on April 8, 2020, the Company does not consider Duncan to be independent." (emphasis omitted)).

Plaintiff's allegations against Goldman, Juneau, and Sledge focus on their overlapping board service at other companies. Goldman, the Board's chairman since the Combination, is on three other boards with his fellow Stone Energy Directors or their associates: he is a director of Weatherford International plc with Sledge; a director of PetroQuest Energy, Inc. with Juneau, and a director of Ultra Petroleum Corp. with Sylvia Barnes, Trimble's wife.[133] Juneau was also once a director at Castex Energy, an affiliate of one of the Sellers and, by extension, Riverstone.[134]

These allegations resemble those in *Highland Legacy Ltd. v. Singer*.[135] There, the plaintiff alleged that certain board members served together on boards of other companies and, from that fact, sought an inference that those directors were dependent or beholden to a potentially conflicted director, raising a doubt as to whether they could fairly consider a litigation demand adverse to that director.[136] The *Highland Legacy* plaintiff, like Plaintiff here, did not make any allegations that directors were "in any way controlled by or financially beholden" to the director in question.[137] The Court concluded that the plaintiff's allegations that the directors "served together on a few boards of unaffiliated companies" were insufficient to

---

[133] *See id.* ¶¶ 162(b), (d), (g).

[134] *See id.* ¶ 162(d).

[135] 2006 WL 741939 (Del. Ch. Mar. 17, 2006).

[136] *See id.* at *5.

[137] *See id.*

show that they were dominated by or beholden to one another.[138] So too here. And the more robust allegation that Juneau served on a board of Riverstone's affiliate in the past does not alone show that he lacked independence from Riverstone.[139]

As for Trimble, Plaintiff focuses on the fact that he graduated from Mississippi State University, where he majored in petroleum engineering; Duncan also attended Mississippi State and earned the same degree.[140] Both Trimble and Duncan have been honored by Mississippi State as Alumni Fellows, Trimble in 2004 and Duncan in 2013.[141] And both made six-figure donations to the Mississippi State University Foundation, where Duncan sits on the board of directors.[142] Even if these attenuated connections could support the inference of a social relationship or personal friendship between the two men, such allegations, standing alone, are insufficient to raise a reasonable doubt about a director's independence.[143] And

---

[138] *See id.*; *see also id.* n.64 (collecting cases).

[139] *See In re Rouse Props., Inc.*, 2018 WL 1226015, at *15 (Del. Ch. Mar. 9, 2018) ("Likewise, Hegarty's *prior* position on the board of Brookfield Office is insufficient in and of itself to raise a reasonable inference that he cannot objectively evaluate a transaction with Brookfield; indeed, Plaintiffs have not even attempted to plead how those supposed ties were in any way material." (citing *Odyssey P'rs, L.P. v. Fleming Cos.*, 735 A.2d 386, 408 (Del. Ch. 1999), and *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014))).

[140] *See* Compl. ¶ 162(i).

[141] *See id.*

[142] *See id.*

[143] *See, e.g.*, *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 178–79 (Del. Ch. 2005) ("Next BOT asserts that Becker lacked independence from Schwartz because he had been Schwartz's close friend for 40–45 years and the two met every ten to fourteen days.

while "Delaware courts have previously recognized that philanthropic relationships with institutions may give rise to questions about a director's independence," those cases "had many more particularized facts about the materiality of the relationship in question that would create a reasonable doubt about the independence of the directors."[144]

In short, none of Hommes, Kendall, Goldman, Juneau, Sledge, or Trimble stood to gain a material personal benefit from the Challenged Transaction or are alleged to have lacked independence from someone who did.

As to *Zuckerberg*'s second prong, Plaintiff did not advance a cohesive theory as to why any of the Company's directors faced a substantial likelihood of liability.[145] To the extent Plaintiff attempts to make this argument through a last-

---

This relationship does not destroy Becker's independence, however. Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." (alterations and internal quotation marks omitted) (quoting *Beam*, 845 A.2d at 1050)), *aff'd*, 906 A.2d 114 (Del. 2006).

[144] *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 n.48 (Del. Ch. 2005) (discussing and distinguishing the philanthropic relationships in several cases, including *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917 (Del. Ch. 2003), *In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692 (Del. Ch. Mar. 27, 2002), and *Lewis v. Fuqua*, 502 A.2d 962 (Del. Ch. 1985)), *aff'd*, 906 A.2d 766 (Del. 2006).

[145] *See* D.I. 48 at 63–64. He similarly failed to advance a theory that any of the directors lacked independence from someone who faced a substantial likelihood of liability.

minute change-of-course at oral argument, casting the Challenged Transaction as waste, that theory was neither pled nor briefed, and so was waived.[146]

Finally, I note that Plaintiff consistently advanced the position that "[d]emand is excused under the second prong of the *Aronson* test because the Challenged Transaction is subject to review under the entire fairness standard."[147] As I have explained, the Challenged Transaction is not subject to entire fairness review due to the presence of a conflicted controller, because Riverstone and Apollo did not form a control group. And more fundamentally, Plaintiff's theory conflating a structurally inspired standard of review with a board-level demand futility rationale was definitively rejected by *Zuckerberg II*:

---

[146] *See* Hr'g Tr. at 137–138; *Emerald P'rs v*, 726 A.2d at 1224.

[147] D.I. 48 at 62; *see also* Hr'g Tr. 150.

50

Although not entirely clear, [plaintiff] appears to argue that because the entire fairness standard of review applies *ab initio* to a conflicted-controller transaction, demand is automatically excused under *Aronson*'s second prong. As the Court of Chancery noted below, some cases have suggested that demand is automatically excused under *Aronson*'s second prong if the complaint raises a reasonable doubt that the business judgment standard of review will apply, even if the business judgment rule is rebutted for a reason unrelated to the conduct or interests of a majority of the directors on the demand board. The Court of Chancery's case law developed in a different direction, however, concluding that demand is not futile under the second prong of *Aronson* simply because entire fairness applies *ab initio* to a controlling stockholder transaction. As the Court of Chancery has explained, the theory that demand should be excused simply because an alleged controlling stockholder stood on both sides of the transaction is "inconsistent with Delaware Supreme Court authority that focuses the test for demand futility exclusively on the ability of a corporation's board of directors to impartially consider a demand to institute litigation on behalf of the corporation—including litigation implicating the interests of a controlling stockholder."

. . .

[Plaintiff] cannot satisfy the demand requirement by pleading—for reasons unrelated to the conduct or interests of a majority of the directors on the demand board—that the entire fairness standard of review would apply to the Reclassification.[148]

Plaintiff's theory similarly fails here.

In sum, Plaintiff has not alleged that a majority of the Board is incapable of "impartially consider[ing] [the demand's] merits without being influenced by

---

[148] *Zuckerberg II*, 2021 WL 4344361, at *13–14 (footnotes omitted) (quoting *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 2015 WL 4192107, at *1 (Del. Ch. July 13, 2015)).

improper considerations."[149]  Demand would not have been futile as to at least six of the ten Board members, so Plaintiff lacks standing to pursue derivative claims on the Company's behalf under Rule 23.1.  His derivative claims in Counts IV, VI, and VII are dismissed.

## III.  CONCLUSION

For the foregoing reasons, Defendants' Motions are **GRANTED** in full.[150]

---

[149] *Rales*, 634 A.2d at 934.

[150] On the last page of his brief, Plaintiff seeks the opportunity to replead.  *See* D.I. 48 at 83.  This is not permitted under Court of Chancery Rule 15(aaa).